AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

In the Matter of the Search of
Two Apple iPhones with Phoenix Barcodes 51001682509 and
51001681639.

Case No. 24-3398MB

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _November 1, 2024_ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _October 18, 2024 @ 11:37 AM_    _M Morrissey_
    *Judge's signature*

City and state: _Phoenix, Arizona_    Honorable MICHAEL T. MORRISSEY, U.S. Magistrate Judge
    *Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is:

a)    A gray Apple iPhone with assigned barcode number 51001682509;

b)    A blue Apple iPhone with assigned barcode number 51001681639;

(hereafter the "**Subject Electronic Storage Media**"). The **Subject Electronic Storage Media** is currently located in the Phoenix Police Department NIBIN evidence room at 620 W. Washington Street, Phoenix, Arizona.

This warrant authorizes the forensic examination of the **Subject Electronic Storage Media** for the purpose of identifying the electronically stored information described in Attachment B.



51001682509



51001681639

## ATTACHMENT B

*Property to be seized*

Any records and information found within the digital contents of the **Subject Electronic Storage Media** that relate to violations of 18 U.S.C. § 371 Conspiracy; 18 U.S.C. 922(a)(6) Material False Statement During the Purchase of a Firearm; and 18 U.S.C. 924(a)(1)(A) False Statement in Records Required to be Kept by an FFL, from April 1, 2024 to September 30, 2024, including:

      a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of firearms, ammunition, and firearm components;

      b.  all information related to buyers or sources of firearms, ammunition, and firearm components (including names, addresses, telephone numbers, contact information, photographs, locations, or any other identifying information);

      c.  all bank records, checks, credit card bills, account information, or other financial records reflecting the disposition of illegal sale of firearms, ammunition, and firearm components;

      d.  all information regarding the receipt, transfer, possession, transportation, or use of proceeds from illegal sale of firearms;

      e.  any information recording schedule or travel;

      f.  evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, videos, correspondence, and phonebooks;

g. evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

h. evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

i. call logs, to include incoming, outgoing, and missed calls, secondary phone number accounts such as Skype, Line 2, and other applications that can assign a second roaming phone number;

j. evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

k. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

l. evidence of the times the electronic storage media were used;

m. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

n. documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

o. records of or information about Internet Protocol addresses used by the electronic storage media;

p. records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

q. Global positioning satellite (GPS) location data stored within the device.

3

2.     Any records and information found within the digital contents of the **Subject Electronic Storage Media** showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, correspondence, photographs, videos and browsing history;

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies).  This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

This warrant allows for a full digital forensic extraction/image of the **Subject Electronic Storage Media** for both exculpatory and inculpatory purposes. Examination of the electronic data from the extraction of the **Subject Electronic Storage Media** is limited between April 1, 2024 to September 30, 2024. Examination of the electronic data includes any records of the aforementioned which has no date range assigned to it or which has been created, accessed, modified, or formatted between April 1, 2024 to September 30, 2024.

This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any

government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the ATF may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Two Apple iPhones with Phoenix Barcodes 51001682509 and<br>51001681639. | Case No. 24- 3398 MB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

### As further described in Attachment A

located in the District of Arizona, there is now concealed:

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 922(a)(6) | Material False Statement During Purchase of a Firearm |
| 18 U.S.C. § 924(a)(1) | False Statement in Records Required to be Kept by an FFL |

The application is based on these facts:

### See attached Affidavit of TFO George Fulton.

☒ Continued on the attached sheet.
☐ Delayed notice of  30  days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA PATRICK E. CHAPMAN

PATRICK CHAPMAN
Digitally signed by PATRICK CHAPMAN
Date: 2024.10.18 08:26:03 -07'00'

_Digitally signed by George Fulton_
_DN: cn=George Fulton, email=george.fulton@atf.gov, c=US_
_Date: 2024.10.18 10:41:37 -04'00'_

_Applicant's Signature_

TFO GEORGE FULTON, ATF
_Printed name and title_

Sworn to before me and signed in my presence.

Date: October 18, 2024

_Judge's signature_

City and state: Phoenix, Arizona

Honorable MICHAEL T. MORRISSEY, U.S. Magistrate Judge
_Printed name and title_

## ATTACHMENT A

*Property to be searched*

The property to be searched is:

a)    A gray Apple iPhone with assigned barcode number 51001682509;

b)    A blue Apple iPhone with assigned barcode number 51001681639;

(hereafter the "**Subject Electronic Storage Media**"). The **Subject Electronic Storage Media** is currently located in the Phoenix Police Department NIBIN evidence room at 620 W. Washington Street, Phoenix, Arizona.

This warrant authorizes the forensic examination of the **Subject Electronic Storage Media** for the purpose of identifying the electronically stored information described in Attachment B.





| 51001682509 | 51001681639 |

## ATTACHMENT B

*Property to be seized*

Any records and information found within the digital contents of the **Subject Electronic Storage Media** that relate to violations of 18 U.S.C. § 371 Conspiracy; 18 U.S.C. 922(a)(6) Material False Statement During the Purchase of a Firearm; and 18 U.S.C. 924(a)(1)(A) False Statement in Records Required to be Kept by an FFL, from April 1, 2024 to September 30, 2024, including:

    a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of firearms, ammunition, and firearm components;

    b.  all information related to buyers or sources of firearms, ammunition, and firearm components (including names, addresses, telephone numbers, contact information, photographs, locations, or any other identifying information);

    c.  all bank records, checks, credit card bills, account information, or other financial records reflecting the disposition of illegal sale of firearms, ammunition, and firearm components;

    d.  all information regarding the receipt, transfer, possession, transportation, or use of proceeds from illegal sale of firearms;

    e.  any information recording schedule or travel;

    f.  evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, videos, correspondence, and phonebooks;

2

g. evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

h. evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

i. call logs, to include incoming, outgoing, and missed calls, secondary phone number accounts such as Skype, Line 2, and other applications that can assign a second roaming phone number;

j. evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

k. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

l. evidence of the times the electronic storage media were used;

m. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

n. documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

o. records of or information about Internet Protocol addresses used by the electronic storage media;

p. records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

q. Global positioning satellite (GPS) location data stored within the device.

3

2.      Any records and information found within the digital contents of the **Subject Electronic Storage Media** showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, correspondence, photographs, videos and browsing history;

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies).  This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

This warrant allows for a full digital forensic extraction/image of the **Subject Electronic Storage Media** for both exculpatory and inculpatory purposes. Examination of the electronic data from the extraction of the **Subject Electronic Storage Media** is limited between April 1, 2024 to September 30, 2024. Examination of the electronic data includes any records of the aforementioned which has no date range assigned to it or which has been created, accessed, modified, or formatted between April 1, 2024 to September 30, 2024.

This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any

4

government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the ATF may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, George Fulton, being first duly sworn, hereby deposes and states as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine the cellular telephone(s) described more particularly in Attachment A:

   a.  Gray Apple iPhone with assigned barcode number 51001682509

   b.  Blue Apple iPhone with assigned barcode number 51001681639

(hereafter the "**Subject Electronic Storage Media**"), and to extract the electronically stored information set forth in Attachment B, which represents evidence and/or instrumentalities of the criminal violations further described below.

2.    I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since August 31, 2019. I have completed the Arizona Law Enforcement Academy at the Phoenix Police Academy in Phoenix, Arizona, and I have been employed with City of Phoenix Police Department (PPD) as a Peace Officer since February 2004. I completed the United States Army Criminal Investigation Division (CID) Special Agent Course and served as a Special Agent in the United States Army Reserves from August 2011 to March 2019.

3.    I obtained a federal commission in the United States Army in 2003 and served as a commissioned officer in the Arizona Army National Guard. As a commissioned officer, I planned and managed numerous military ranges. I have served as platoon leader in a "gun truck" company during combat operations in Iraq between 2009 and 2010. As a CID Special Agent, I attended the Defense Intelligence Agency (DIA) threat financing course and training by the Arizona Attorney General Office for money laundering.

4.    I am currently assigned to the Phoenix Police Department's Crime Gun Intelligence Unit (CGIU) within the Violent Crimes Bureau. During my time as both a detective and special agent, I have conducted investigations of violent crimes, specifically:

Homicide, Aggravated Assault, Armed Robberies, Misconduct Involving Weapons, Money Laundering, Fraud, Theft of Firearms and Illegal Trafficking of Firearms.

5.      The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; and surveillance conducted by law enforcement officers.

6.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

7.      Based on my training and experience and the facts set forth in this Affidavit, your Affiant submits there is probable cause to believe that Tanner Keith King AMACK, Johnny Dakota WEEKS, and others known and unknown, have committed, are committing, and will commit violations of 18 U.S.C. § 371 Conspiracy; 18 U.S.C. 922(a)(6) Material False Statement During the Purchase of a Firearm; and 18 U.S.C. 924(a)(1)(A) False Statement in Records Required to be Kept by an FFL. There is also probable cause to search the information described in Attachments A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachments B.

## PROBABLE CAUSE

8.      On June 24, 2024, your Affiant received a trace notification as part of separate criminal investigation for a Glock 22C pistol. The firearm was observed in a subject's cell phone regarding the sale of the firearm. The trace notification for the firearm showed Tanner Keith King AMACK (hereafter referred to as AMACK) had purchased the Glock 22C pistol on April 16, 2024, from North Phoenix Pawn, at 10620 N. 19th Avenue, Phoenix, Arizona.

9.      On June 26, 2024, Devin Cunningham (hereafter referred to as CUNNINGHAM) purchased a Century Arms International, VSKA rifle from Tombstone

Tactical, a Federal Firearms Licensee (FFL) at 10005 N. Metro Parkway East, Phoenix, Arizona. CUNNINGHAM completed an ATF Form 4473 (Firearms Transactions Record) and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

10. On July 8, 2024, CUNNINGHAM purchased two (2) Century Arms International, BFT47 rifles from Santan Reptiles and Firearms, an FFL, at 42332 W. Posada Drive, Maricopa, Arizona. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

11. On July 15, 2024, AMACK purchased a Century Arms International, VSKA pistol from Tombstone Tactical. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

12. Video surveillance from the store showed AMACK arriving in a white 2001 Toyota RAV4 with Arizona license plate "PXA77W." AMACK exited from the rear driver side passenger seat as a second male, Johnny Dakota WEEKS (hereafter referred to as WEEKS) exited from the driver seat. Both WEEKS and AMACK then entered Tombstone Tactical. A second video showed AMACK sitting at the counter after selecting the firearm, counting cash he removed from his right pocket. WEEKS stood by AMACK looking around as AMACK counted the money.

13. A third male, identified as Patrick GLASCO (hereafter referred to as GLASCO), was seen in the background looking at other firearms before approaching AMACK. The two began talking as AMACK received the firearm and the two exited the store. An exterior video showed WEEKS already in the driver seat as GLASCO and AMACK entered the rear passenger seat of the RAV4.

14. On July 16, 2024, AMACK purchased a Century Arms International, VSKA rifle from Tactical Studio, an FFL, at 5023 W. Olive Avenue, Glendale, Arizona. AMACK completed an ATF Form 4473 (Firearms Transactions Record) for the purchase and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

15. On July 17, 2024, AMACK purchased a Century Arms International, VSKA rifle from Lone Wolf Trading, an FFL, at 5140 W. Peoria Avenue, Glendale, Arizona.

AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

16.    On the same day, AMACK purchased another Century Arms International, VSKA rifle from Tactical Studio. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

17.    On July 18, 2024, AMACK purchased a Riley Defense, RAK47 rifle from Ammo AZ, an FFL, at 5350 W. Bell Road, Glendale, Arizona. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

18.    On the same day, AMACK purchased a Romarm, WASR-10 rifle from Tombstone Tactical. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

19.    Video surveillance from Tombstone Tactical showed AMACK arriving at the store in a gray Honda sedan with WEEKS and GLASCO. AMACK removed cash from his pocket and appeared to count money on his lap for the purchase of the firearm. During this time, WEEKS and AMACK accessed their cell phones.

20.    On July 19, 2024, AMACK purchased a Riley Defense, RAK47 rifle from Ammo AZ. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

21.    On the same day, CUNNINGHAM purchased a Pioneer Arms, Hellpup rifle from Ammo AZ. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

22.    On July 20, 2024, AMACK purchased a Century Arms International, VSKA Rifle from Tactical Studio. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

23.    Video surveillance from the store showed AMACK arriving in the same white Toyota RAV4 he was seen exiting on July 15, 2024. AMACK was the only subject who entered the store and again paid cash for the firearm purchase. AMACK then exited the

store with the rifle and entered the rear passenger seat of the RAV4 with the firearm. The vehicle then drove way.

24. On the same day, CUNNINGHAM purchased a Century Arms International, BFT47 rifle from Tombstone Tactical. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

25. Later on the same day, CUNNINGHAM purchased two (2) Glock pistols from Santan Reptiles and Firearms. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

26. On July 22, 2024, AMACK purchased a Century Arms International, VSKA rifle from Tactical Studio. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

27. On July 25, 2024, CUNNINGHAM purchased a Century Arms International, VSKA rifle from Turner's Outdoorsman, an FFL, at 15389 W. McDowell Road, Goodyear, Arizona. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

28. Video surveillance from the store showed CUNNINGHAM and WEEKS approaching the firearm counter at the store. While CUNNINGHAM was looking at various AK-47-style firearms, WEEKS answered his cell phone and walked away from the gun counter to a separate aisle. After the phone call appeared to end, WEEKS went back to the counter with CUNNINGHAM, who appeared to be completing the ATF Form 4473. CUNNINGHAM removed case from his pocket and counted out money, placed some in his pocket, and handed the rest of the cash to the clerk. WEEKS and CUNNINGHAM then exited the store together with CUNNINGHAM carrying the rifle.

29. On July 26, 2024, CUNNINGHAM purchased a Romarm, WASR-10 rifle from Tombstone Tactical. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

30.     On July 27, 2024, AMACK purchased a Century Arms International, VSKA rifle from Ammo AZ. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

31.     On the same day, AMACK purchased a Romarm, WASR-10UF rifle from Tactical Studio. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

32.     On the same day, WEEKS, purchased a Century Arms International, VSKA rifle from Tactical Studio. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

33.     On July 28, 2024, AMACK attempted to purchase a Century Arms International VSKA rifle from Lone Wolf Trading, an FFL, at 5140 W. Peoria Avenue, Glendale, Arizona. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona. The store declined the purchase upon learning AMACK had previously purchased a similar rifle from the store. The store noted the initial purchase was made in cash with $100 bills.

34.     On July 29, 2024, AMACK purchased a Pioneer Arms, Hellpup rifle and a Glock 20 pistol from Ammo AZ. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

35.     On the same day, CUNNINGHAM purchased two (2) Pioneer Arms, Hellpup rifles from Ammo AZ. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

36.     On the same day, WEEKS purchased a Century Arms International, VSKA rifle; Glock 23 pistol; and Pioneer Arms, Hellpup rifle from Ammo AZ. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

37.     On July 30, 2024, WEEKS purchased a Century Arms, VSKA rifle from S2 Armament, an FFL, at 4139 W. Bell Road, Phoenix, Arizona. WEEKS completed an ATF

Form 4473 (Firearms Transactions Record) and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

38.    On the same day, your Affiant was made aware from ATF Crime Gun Intelligence Center (CGIC) of the purchasing pattern of AMACK, WEEKS, and CUNNINGHAM. Your Affiant learned an FFL had notified ATF of suspicious purchases of AK-47-style firearms. A review of records showed AMACK had purchased ten (10) such firearms and CUNNINGHAM had purchased six (6).

39.    On July 31, 2024, AMACK purchased a Century Arms, VSKA rifle and Glock 22 pistol from Tactical Studio. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

40.    On the same day, AMACK purchased a Century Arms, VSKA rifle from S2 Armament. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

41.    On the same day, WEEKS purchased a Century Arms, VSKA rifle from Tactical Studio. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

42.    On August 1, 2024, AMACK purchased two (2) Century Arms International, VSKA rifles from S2 Armament. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

43.    On the same day, CUNNINGHAM purchased three (3) Century Arms International, VSKA rifle from S2 Armament. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

44.    On August 3, 2024, WEEKS purchased two (2) Century Arms International, VSKA rifles from S2 Armament. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

45.     On the same day, WEEKS purchased a Riley Defense, RAK47 rifle from Turner's Outdoorsman. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

46.     On the same day, WEEKS purchased two (2) Century Arms International, VSKA rifles from Santan Reptiles and Firearms. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

47.     On the same day, CUNNINGHAM purchased four (4) Century Arms International, VSKA rifles from Santan Reptiles and Firearms. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

48.     On August 7, 2024, AMACK purchased a Pioneer Arms, Hellpup rifle from Ammo AZ. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

49.     On the same day, WEEKS purchased a Century Arms, BFT47 rifle from Tuner's Outdoorsman. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

50.     Video surveillance from the store showed AMACK and WEEKS walking to the firearms counter. AMACK began talking to the clerk and pointing to firearms on display behind the clerk. The clerk handed WEEKS an AK-47-style rifle and handed another AK-47-style firearm to AMACK. The two quickly looked at the firearms before WEEKS pulled out his identification and placed it on the counter. AMACK filled out an ATF Form 4473 on the counter. WEEKS obtained ATF Form 4473 did the same.

51.     AMACK and WEEKS then both paid for their respective firearms in cash. The cashier then handed WEEKS the firearm, and he appeared to wait for AMACK. A clerk then provided AMACK with two (2) firearms and WEEKS and AMACK exited the store. Investigators are still awaiting receipt of the ATF Form 4473 for AMACK's purchase on this date.

52.     On August 8, 2024, AMACK purchased an FN M249S rifle from Turner's Outdoorsman. AMACK completed an ATF Form 4473 and listed his current residence and address as 7551 W. Turquoise Drive, Peoria, Arizona.

53.     Video surveillance from the store showed AMACK walking up to the gun counter with another unknown subject. AMACK talked to the clerk who then went and obtained a large box. Your Affiant is aware the size of the box was similar to the boxes used for the packaging and shipping of FN M249S rifles. The clerk appeared to go over the feature of the firearm before AMACK pulled out a large sum of cash from his pocket. AMACK then counted the money out and three additional clerks assisted in counting the currency for the purchase of the firearm.

54.     On the same day, AMACK, WEEKS, and CUNNINGHAM each attempted to purchase AK-47-style firearms from S2 Armament. AMACK, WEEKS, and CUNNINGHAM each completed an ATF Form 4473 for the purchase of their firearms but the owner of the store delayed the transaction, advising the three they would need to come back the following week to pick up the firearms. After AMACK, WEEKS and CUNNINGHAM left the store, the clerk notified Special Agent Cauble with ATF of what he believed was a suspicious purchase.

55.     On August 9, 2024, WEEKS purchased a Pioneer Arms, Hellpup rifle from Turner's Outdoorsman. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

56.     On the same day, CUNNINGHAM purchased a Riley Defense, RAK47 rifle from Turner's Outdoorsman. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

57.     Video surveillance from the store showed both CUNNINGHAM and WEEKS walking up to the gun counter together. WEEKS was texting on his cell phone as the two approached the counter. CUNNINGHAM provided his identification to the clerk prior to looking at any firearms. The clerk provided an AK-47-style firearm to CUNNINGHAM, and WEEKS handed his identification to the clerk.

58.    WEEKS and CUNNINGHAM then selected AK-47-style firearms and paid for the firearms with cash. Both completed ATF Form 4473 and exited the store together, carrying the firearms they purchased.

59.    On the same day, your Affiant was notified by SA Cauble of AMACK, WEEKS, and CUNNINGHAM's attempted purchase from S2 Armament. The FFL had advised the subjects that they received a delay from the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS).

60.    On August 10, 2024, WEEKS purchased a Century Arms, VSKA rifle from Ammo AZ. WEEKS completed an ATF Form 4473 and listed his current residence and address as 1031 E. Manhatton Drive, Tempe, Arizona.

61.    On the same day, CUNNINGHAM purchased a Pioneer Arms, Sporter rifle, from Ammo AZ. CUNNINGHAM completed an ATF Form 4473 and listed his current residence and address as 53909 W. Terra Drive, Maricopa, Arizona.

62.    On August 12, 2024, investigators contacted witness #1, the owner of S2 Armament. Witness #1 advised he became suspicious of AMACK, WEEKS, and CUNNINGHAM when they came into the store to purchase additional AK-47-style firearms. He was aware each one had previously been to the store at different times, purchasing AK-47-style firearms. He recalled that when the three entered the store, they acted as though they did not know each other. While inside the store, it became clear they knew each other was and began talking. Witness #1 stated he became concerned because of the repetitive purchase of similar firearms from all three.

63. Your Affiant seized the three firearms that AMACK, WEEKS, and CUNNINGHAM had already paid for. I also left several business cards for Witness #1 to give to the three. Witness #1 was additionally informed to advise the three that the firearms had been seized by law enforcement and requested that they contact me.

64.    On August 15, 2024, I obtained records for the 2nd Quarter of 2024 through the Department of Economic Security (DES) for AMACK, CUNNINGHAM, and WEEKS. The records showed AMACK made $7,977.00 for the quarter, CUNNINGHAM made

$11,284 for the quarter, and WEEKS showed no income or unemployment reported for 2024.

65.    On August 21, 2024 at approximately 6:11 p.m., the Phoenix Police Department responded to a residential burglary call at 5150 N. 39th Avenue, Apartment #310. When officers arrived, they learned from the victims that several subjects had kicked in the door to the apartment and assaulted them with one of the subjects holding a firearm in their direction.

66.    Investigators learned from victim #1 that they were having a dispute with Tierra Amack, a former co-worker. Victim #1 identified Tierra Amack and AMACK as two of the subjects who forced entry into the apartment and assaulted her. Victim #1 provided she was good friends with Tierra prior to the dispute and knew AMACK through Tierra. The victim provided social media handles for Tierra and AMACK to investigators.

67.    Victim #1 related she worked at a gentleman's club in Tucson along with Tierra. The two have known each other for a year but became friends in the last four to five months. Victim #1 moved into the apartment complex at the same time Tierra and her boyfriend WEEKS moved into the apartment complex.

68.    Investigators spoke to victim #2, who provided his girlfriend was having issues with Tierra. The two began arguing again over the phone and his girlfriend challenged Tierra to a fight. Victim #2 recalled shortly after he heard someone pounding on the front door to their apartment. He looked out the kitchen window and saw AMACK walking up to the front door with another subject.

69.    Victim #2 told his girlfriend to go to the back bedroom. He recalled while they were in the back bedroom that he heard five to six loud kicks on the front door. When the door kicked open, he saw one of the subjects enter the apartment holding a firearm. He made his girlfriend go the bathroom closet when the subject with the firearm started saying "go go go go in." Victim #2 saw AMACK entering the apartment with several other subjects. He recalled trying to close the bathroom door when the door was kicked in.

70.    Victim #2 recalled seeing two of the subjects with firearms and AMACK hitting him with another individual. Victim #2 said he saw victim #1 being assaulted by three of the subjects. Following the assault, the subjects took victim #1's cell phone, cash, and victim #1's wallet. Victim #2 said WEEKS was not present for the incident and that WEEKS was a former friend and roommate.

71.    On the same day, I was notified WEEKS was attempting to obtain a Carry Concealed Weapons permit (CCW) from the Arizona Department of Public Safety.

72.    On August 29, 2024, I was contacted by the case agent regarding the home invasion. On the same day between 9 and 10 p.m., WEEKS was contacted by officers driving a black 2007 Mercedes Benz with an Arizona license plate "K9A7BX." During the traffic stop, officers identified the passengers in the vehicle as Tierra Amack, Keon Glasco, and Onya Ehrig. Officers noted that while talking with WEEKS, a gray sedan driven by AMACK arrived at the traffic stop. AMACK stayed a distance away from the officers before leaving the area.

73.    When PPD officers initially spoke with WEEKS, he provided his address was 99th avenue and Camelback Road. Officers asked WEEKS a second time about his address prior to his release, and WEEKS provided 1031 E. Manhatton Drive, Tempe, Arizona. Officers also documented that WEEKS had a Glock 23 pistol in the car.

74.    On September 10, 2024, PPD Detective Buffa obtained the lease agreement for Tierra Amack's apartment at 5150 N 99th Avenue, #1144. The agreement showed WEEKS was the sole person who signed for the apartment. WEEKS signed the agreement on June 20, 2024.

75.    On September 15, 2024, I was notified the firearm purchased on August 3, 2024 by CUNNINGHAM had been recovered in Nogales, Mexico on September 2, 2024. I learned the firearm had been purchased from Santan Reptiles and Firearms.

76.    On September 25, 2025 at approximately 1:49 a.m. PPD Officers contacted WEEKS and Tierra Amack at 2700 W. Glenrosa Avenue during a traffic stop. Officers learned WEEKS had a Glock 23 pistol on him and Tierra provided she had a firearm in her

purse. During the traffic stop, two other subjects in the vehicle did not want to identify themselves to officers. The two subjects were allowed to exit the vehicle and walked away from the traffic stop.

77.     On the same day at approximately 1:51 p.m., PPD Special Assignment Unit (SAU) took AMACK into custody reference the home invasion. AMACK's cell phone, a gray Apple iPhone, was impounded incident to arrest. AMACK identified the gray iPhone as his own during an interview on the same day. PPD SAU additionally took WEEKS, GLASCO, Tierra Amack, Kylee Kilpatrick, and Walter Mims into custody as they were leaving the apartment complex at 6161 W. McDowell Road. PPD investigators served search warrants at AMACK's residence at 6161 W. McDowell Road, #1187 in Phoenix, and WEEKS's residence at 5150 North 99th Avenue, #1141, also in Phoenix.

78.     I learned from PPD investigators that 6161 W. McDowell Road, #1187 was AMACK's current residence. He had resided at this apartment for the past month. During the search of the apartment, no firearms were found. Investigators did photograph AMACK's Arizona identification, which listed the address of 7551 W. Turquois Drive, Peoria, Arizona.

79.     On the same day at approximately 2:44 p.m., I conducted a post-*Miranda* interview with WEEKS. WEEKS said he was living at 1031 E. Manhatton Drive but had recently moved to 5150 North 99th Avenue with his girlfriend, Tierra Amack. He had just moved all of his things to the new apartment to live with Tierra. WEEKS related that Tierra had moved into the apartment first and was living there on her own while he was still living with Tierra's uncle at 1031 E. Manhatton Drive.

80.     WEEKS stated he was a gun enthusiast and liked different versions of "AKs." He had sold a couple of the AKs after he customized them. He related he only sold the firearms for what he paid for them. WEEKS later changed his story advising he made $100 to $200 above the price of the firearm he had purchased.

81.     WEEKS initially stated he never purchased firearms for other people. He then recanted the statement, providing he had been solicited by an unknown subject (hereafter

referred to as subject #1) to purchase firearms. WEEKS identified a purchase of four (4) AK-47-style firearms from Santan Reptiles as a straw purchase for subject #1. He was given the money to purchase the firearms and was directed by subject #1 to contact Santan Reptiles and Firearms to get the four rifles. WEEKS believed initially the purchase was going to be a private, person-to-person sale, as after paying for the rifles the person wanted to run a background check on WEEKS.

82.    WEEKS confirmed the firearms purchased from S2 Armament were for subject #1. WEEKS related he believed the firearms handed over to subject #1 were going "somewhere, bad place." WEEKS clarified with that he believed the firearms were going to Mexico. The firearms were going to be used for "war," because "Mexico's always fighting. So, I think that's why they needed them . . ." WEEKS related he made these purchases for subject #1 because he needed the money. He informed investigators he provided the contact number for subject #1 to AMACK. He was not sure who AMACK was selling his firearms to but believed he was selling them to the same person.

83.    WEEKS identified his cell phone as being an Apple iPhone with a screen shot of him and Tierra on the phone. WEEKS provided the passcode for the cell phone as "1-9-7-1-0-0." WEEKS provided he contacted subject #1 through telegram, a cell phone messaging application. He further had posted ads for the sale of firearms on Armslist.com, a classified advertisements website with sections devoted to firearms, firearm accessories, and outdoor equipment.

84.    On the same day at approximately 5:28 p.m., investigators interviewed witness #2 at 5150 N. 99th avenue, #1144 after she was detained for the service of a state search warrant. Witness #2 provided she was at WEEKS's apartment dog sitting while Tierra and WEEKS were out. Witness #2 stated she had met WEEKS and Tierra through her boyfriend. Her boyfriend had been friends with AMACK.

85.    Witness #2 provided they had stopped talking for a period of time with WEEKS and Tierra until the two moved into the apartment complex. Witness #2 stated that AMACK had been using her parents' address, 7551 W. Turquoise Drive, without her

parents' permission. She had given him permission to use the address to mail things to but not for him to use as a physical address. Witness #2 related AMACK had never lived at the address nor had permission to use the address on an identification. She was aware AMACK was told by her parents for him to cut the identification up.

86.    On the same day at approximately 7:01 p.m., I conducted a post-*Miranda* interview with AMACK. AMACK confirmed he was living at 6161 W. McDowell Road for the past month. He was currently living at the apartment with GLASCO, relating the two had moved into the apartment sometime in August. Prior to moving into the apartment, he was essentially homeless, but advised he was living at 1031 E. Manhatton Drive prior to moving into his current apartment.

87.    AMACK confirmed that he never lived at 7551 W. Turquoise Avenue. He used the address to get his mail because he believed the people there were trustworthy. AMACK advised he still had all the firearms he purchased and planned on selling them after adding aftermarket parts to them. He was waiting to get his Federal Firearms License to sell the firearms. AMACK stated the firearms were not at his apartment because there were babies there.

88.    I questioned AMACK about the purchase of the FN M249S, and AMACK asked if I was referring to an "LMG." AMACK provided he thought LMG stood for long machine gun. I am aware that "LMG" is an acronym commonly used to refer to a "light machine gun." AMACK related he was solicited by another person to purchase the firearm, advising the two were going to own the firearm together. He was given approximately $3,000 to $4,000 to help pay for the firearm.

89.    AMACK would not provide the location of where he stored the firearms, advising he wanted to notify the other person before law enforcement could verify his statements. AMACK related the other person had a machine to place decorative labels on the firearms for the purposes of reselling them. They have not sold any of the rifles he purchased and were waiting to get an FFL.

90.     AMACK identified a gray Apple iPhone with assigned barcode number 51001682509 as belonging to him. A screenshot on the Apple iPhone showed a picture of AMACK looking into a mirror. AMACK provided the passcode to phone, which investigators verified unlocked the phone, before locking the phone again.

91.     I contacted PPD detectives who served a state search warrant on the 2007 Mercedes Benz WEEKS was contacted in. I obtained a blue Apple iPhone with assigned barcode number 51001681639 from PPD detectives. The screen shot on the phone is of WEEKS and Tierra together. I checked the passcode provided by WEEKS, which unlocked the phone. I then relocked the phone, immediately upon unlocking the cell phone.

92.     The gray Apple iPhone with assigned barcode number 51001682509 and blue Apple iPhone with assigned barcode number 51001681639 (collectively referred to as **Subject Electronic Storage Media**) were returned to PPD Investigators for impounding as evidence reference the armed robbery investigation.

93.     On September 30, 2024, investigators contacted witness #3 at 1031 E. Manhatton Drive regarding AMACK and WEEKS residing at the address. Witness #3 was shown photos of WEEKS, AMACK, and Tierra Amack. Witness #3 identified Tierra as person who would come and visit him at his residence. He recognized WEEKS as a person by the name of "Jay." He did not recognize AMACK. Witness #3 related Tierra, WEEKS, and AMACK did not live at the residence, nor have they lived at the residence. The only person who visited the residence was Tierra.

94.     On October 3, 2024 at approximately 2:55 p.m., investigators contacted witness #4 at 7551 W. Turquoise Drive regarding AMACK using their address. Witness #4 stated AMACK did not live at the address, nor did he ever live there. Witness #4 provided AMACK did not have permission to use their address on his identification. When he learned of AMACK having their address on his identification, he told AMACK to cut it up. Witness #4 further provided he did not like AMACK, and he had only been to their house a couple of times because of his stepdaughter's boyfriend. He further had to kick him out of the house during one altercation.

95.    On the same day at approximately 5:17 p.m., investigators spoke with witness #5 by phone. Witness #5 related AMACK had never lived at 7551 W. Turquoise Drive. He was not given permission to use their address and related she has lived at the residence for the past ten years. She only knew AMACK as an acquaintance to her daughter.

96.    On October 6, 2024 at approximately 6:26 p.m., investigators spoke with victim #2 regarding his relationship with WEEKS. Victim #2 advised that WEEKS and him used to be roommates. The two lived together on the "southside" near South Mountain. They stopped being roommates when the two got separate apartments at 5150 North 99th Avenue. Victim #2 advised WEEKS never lived at 1031 E. Manhatton Drive. He knew this address to be an ex-boyfriend to Tierra.

97.    A document found in WEEKS's apartment from the Maricopa County Sheriff's Office showed victim #2 listing 8318 S. Central Avenue as his residence when he bonded WEEKS out of jail. This location is approximately within a mile of the entrance to South Mountain park.

98.    A review of all documents obtained regarding the purchase and transfer of firearms to AMACK, CUNNINGHAM, and WEEKS was completed by investigators. The documents indicate a total of seventy-six (76) firearms were purchased between the three. WEEKS purchased a total of twenty-two (22) firearms. AMACK purchased a total of thirty-one (31) firearms. CUNNINGHAM purchased a total of twenty-three (23) firearms. Below is a listing of the purchases.

| # Firearms | Make | Model | Purchaser |
|---|---|---|---|
| 2 | Century Arms | BFT47 | AMACK |
| 15 | Century Arms | VSKA | AMACK |
| 1 | F.N. | M249S | AMACK |
| 3 | Glock | 20/22C/22 | AMACK |
| 2 | Pioneer Arms | Hellpup | AMACK |
| 1 | Pioneer Arms | Sporter | AMACK |
| 4 | Riley Defense | RAK47 | AMACK |

| | | | |
|---|---|---|---|
| 2 | ROMARM | WASR-10 | AMACK |
| 3 | Century Arms | BFT47 | CUNNINGHAM |
| 11 | Century Arms | VSKA | CUNNINGHAM |
| 2 | Glock | 48/43X | CUNNINGHAM |
| 4 | Pioneer Arms | Hellpup | CUNNINGHAM |
| 1 | Riley Defense | RAK47 | CUNNINGHAM |
| 2 | ROMARM | WASR-10 | CUNNINGHAM |
| 1 | Century Arms | BFT47 | WEEKS |
| 12 | Century Arms | VSKA | WEEKS |
| 1 | Glock | 23 | WEEKS |
| 3 | Pioneer Arms | Hellpup | WEEKS |
| 1 | Pioneer Arms | Sporter | WEEKS |
| 3 | Riley Defense | RAK47 | WEEKS |
| 1 | ROMARM | WASR-10 | WEEKS |

99.    Your Affiant noted that approximately sixty-eight (68) of the firearms purchased by WEEKS, CUNNINGHAM, and AMACK were AK-47-style firearms. I know these firearms are highly desired by Drug Trafficking Organizations (DTOs) and are currently in higher the normal demand. I further saw the purchasing pattern of WEEKS, CUNNINGHAM, and AMACK appeared to be structured purchases to avoid law enforcement detection. There were multiple single firearm purchases from different stores within a short time frame. I know this is a common practice with subjects involved in illegal firearms trafficking attempting to conceal their purchasing pattern from law enforcement.

100.    Below is a list of money spent for the listed purchases. This review was conducted with receipts obtained currently and does not reflect all firearms that have been transferred to WEEKS, AMACK, or CUNNINGHAM:

$27,495.71 (CASH) – AMACK

$9,967.48 (CASH) – CUNNINGHAM

$8,822.24 (CASH) – WEEKS

101.    I know from other investigations the current prices being offered for subjects to purchase firearms for other people (commonly referred to as a "straw purchase") are approximately $100 to $200 per rifle. The typical sale price of an AK-47 in the private sector is $1,000 to $1,200 for firearms that are sought by DTOs. The current money being offered for the straw purchase of an FN M249S is approximately $1,000 to $3,000 dollars per firearm. Based on firearms transferred to AMACK, CUNNINGHAM, and WEEKS, the following is an estimated profit, based on $100 to 200 per rifle and $1,000 to $3,000 per M249S:

> $3,700.00 to $8,400 - AMACK
>
> $2,100.00 to $4,200 – CUNNINGHAM
>
> $2,100.00 to $4,200 – WEEKS

102.    The **Subject Electronic Storage Media** are currently in the lawful possession of ATF and the Phoenix Police Department. The Phoenix Police Department came into lawful possession of the **Subject Electronic Storage Media** during a lawful traffic stop and search incident to arrest. PPD transferred custody of **Subject Electronic Storage Media** to ATF. The **Subject Electronic Storage Media** are currently in storage at PPD, 100 E. Elwood Street, Phoenix, Arizona. In my training and experience, I know that the **Subject Electronic Storage Media** have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Electronic Storage Media** first came into the possession of PPD.

## II.    ITEMS TO BE SEIZED

103.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the **Subject Electronic Storage Media**.

104.    Based on my training, education, experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Subjects involved in illegal firearms trafficking commonly use various forms of web-based communications platforms (i.e. Facebook, Snapchat, Instagram, What's App messenger) to communicate about their illegal activities. Because various social media platforms are used for communication, conversations may be partial or incomplete, as the users are transitioning from one platform to another. However, when the various communication platforms are placed together these conversations can be combined or pieced together to complete the full conversation. This allows context to the conversation to determine if a single sentence is truly criminal in nature.

b.    Subject(s) can access these communication platforms both by cellular telephone and computer. These communication platforms are internet-based and the digital media from them are likely to be retained on **Subject Electronic Storage Media**.

c.    Illegal firearms traffickers commonly use cellular telephones to communicate with other traffickers and customers about firearm-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. The contents of these conversations can be accessed and retained by computers linked to the cellular telephone or social media. Moreover, firearms traffickers commonly use other capabilities of cellular telephones to further their trafficking activities. Therefore, evidence related to firearm trafficking and drug trafficking activity is likely to be found on the **Subject Electronic Storage Media**.

d.    Illegal firearms traffickers often have access to large amounts of United States currency in order to maintain and finance their ongoing trafficking activities. Therefore, records of the movement of firearm trafficking proceeds, including deposits, transfers, and purchases, are likely to be found on the **Subject Electronic Storage Media**.

e.    Illegal firearms traffickers commonly take photographs of their firearms. This is often done to either for the sale of the firearms or to promote their status as a trafficker. Therefore, photographs of firearms and records related to the possession, acquisition, and sale of firearms are likely to be found on the **Subject Electronic Storage Media**.

105.    In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Subject Electronic Storage Media**.

### III.    DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

106.    As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the **Subject Electronic Storage Media**. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

107.    *Probable cause.* Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the **Subject Electronic Storage Media** for at least the following reasons:

a.    Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime.  The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.    Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c.    Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

d.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

108.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the **Subject Electronic Storage Media** because:

a.     Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner.  Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used.  For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet.  Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation.  Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The geographic and timeline information described herein may either inculpate or

exculpate the user of the cellular telephone. Last, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.    A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

        d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.    Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    109.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the **Subject Electronic Storage Media**, including the use of computer-assisted scans.

110.   *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## IV.   CONCLUSION

111.   Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence and/or instrumentalities of 18 U.S.C. § 371 Conspiracy; 18 U.S.C. 922(a)(6) Material False Statement During the Purchase of a Firearm; and 18 U.S.C. 924(a)(1)(A) False Statement in Records Required to be Kept by an FFL, are likely to be found in the contents of the **Subject Electronic Storage Media** further described in Attachment A.

Digitally signed by George Fulton
DN: cn=George Fulton,
email=george.fulton@atf.gov, c=US
Date: 2024.10.18 10:41:10 -04'00'

Task Force Officer George Fulton
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to telephonically before me this ___18___ day of October 2024.

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge